[Crim. No. 24173. Aug. 19, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD JAMES MOTTON, Defendant and Appellant.

599

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Neil Rosenbaum, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

Cecil Hicks, District Attorney (Orange), Michael R. Capizzi, Assistant District Attorney, William W. Bedsworth and Jan J. Nolan, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—Defendant appeals from a conviction for second degree murder. During the selection of the jury, defense counsel objected that the prosecutor was exercising his peremptory challenges to exclude Black women from the jury. Counsel subsequently objected that the prosecutor was excluding Blacks generally. We reverse the judgment on the ground that the trial court erred on both occasions in finding that counsel had not made a prima facie case of discriminatory exclusion.

In *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], we recognized the danger that peremptory challenges could be employed in a way that would undermine the right to a representative jury. Our opinion distinguished between "specific bias"—defined as "a bias relating to the particular case on trial or the parties or witnesses thereto" (p. 276)—and "group bias"—a presumption "that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds" (*id.*). ■ We concluded that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community. . . ." (Pp. 276-277.)

We then turned to the question of remedy. ■ "If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (P. 280, fn. omitted.)

Once the court determines that a prima facie case has been made, the burden shifts to the other party to show, if he can, that the peremptory challenges were not based on group bias. (P. 281.) No such showing was attempted in the present case, however, because the court ruled that de-

fendant had failed to present a prima facie case. The correctness of that ruling is the principal issue raised by this appeal.

During the third day of voir dire, the prosecutor exercised a peremptory challenge to dismiss Margaret Jackson, a Black woman, leaving no Blacks on the jury. Counsel objected that the prosecutor had struck all Black female jurors. The court initially disputed the contention, claiming that the defense had challenged Alyce Brown, another Black woman, but the prosecutor acknowledged that he had challenged her. The judge then said, "All right. So your statement of all Black women is accurate. All right. But you excused a Black man." Defense counsel replied that his challenge was based on specific bias, and he was not using color as a basis for exclusion.

The prosecutor then argued that defendant had not made a prima facie showing of discriminatory challenges because the prosecution had passed the jury when Blacks were still seated. The court invited defense counsel to suggest those Black jurors who counsel thought were challenged without a suitable reason. Counsel suggested Marjorie Morrow. The prosecutor said that "she was awfully proper and very stern looking and impressed me as fairly hostile to me."

When defense counsel disputed the prosecutor's characterization of juror Morrow, the judge suddenly changed the subject, and asked him, "What's so magic about Black women?" "I can see the race," the judge said, "But now you're going a step further and saying, 'Well, I don't mind getting rid of the Black men. I have been bouncing those myself but Black women. . . .' So I'd like to hear from you what it is about the Black women that has some special quality in it."

Defense counsel replied that the women had been excused "in a group," apparently referring to the concept of group bias as explained in *Wheeler*. The judge again confused the defendant's duty to present a prima facie case as set out in *Wheeler*, and the prosecutor's duty to explain the challenges once a prima facie case is established, and asked the prosecutor to explain why he had challenged Alyce Brown. The prosecutor declined to do so until the judge ruled as to whether defendant had made a prima facie showing.

Defense counsel argued that Black women were a cognizable group within the *Wheeler* rule. The judge rejected that argument: "You can have a cognizable group of people who wear toupees. Actually, everybody that I have been able to detect that wore toupees with respect to jurors have been excused, too; but is there some significance to that. . . . You have got women on the jury. What function does a Black woman fulfill that the White woman doesn't?"

Defendant described the group as one involving a "concurrence of racial and sexual identity" and asserted he had made a prima facie showing. The judge then denied the motion. When counsel asked the grounds for the ruling, she said, "I think it's totally fallacious. I don't even think it's taken seriously. . . . I have listened to each challenge and looked at the jurors as they have been excluded. There were jurors that didn't surprise me a bit . . . that I didn't think there was anything racial in it at all, at all."

The next day the prosecutor used a peremptory challenge to excuse Warren Morris, a Black male. Defense counsel again objected, and inquired, "Is the record clear with respect to the situation that there were four Black females, in fact, excused?" The judge replied, "Oh, I doubt very much, because I think the spoken record does not reflect the nationality . . . or race of anyone." Counsel suggested it would be appropriate for the record to reflect the challenges, but the judge disagreed: "I don't have any recollection how many. You people said in chambers how many, although yesterday your objection was directed to excusing every Black female. I haven't kept a record of how many Black males that you have excused or haven't excused. I just don't know, and at that point I think that I'll just leave that as a problem for both lawyers to have, to augment it on appeal. . . ."

Counsel stated that all that was required was "a simple head count," and asked for agreement on the number. The judge rejected that suggestion: "No, it's now gone. There is no way I can recapture that, and I'm not about—you people have made statements. I have lived too long to know that attorneys are not always accurate. . . . And I'm not prepared to just guess. I didn't look at them in this case. I made no notation. Now, if there is an appeal by one side or the other, you both will have the responsibility of augmenting the record."

The dialogue continued. Counsel asserted that "[t]he *Wheeler* case indicates that it's appropriate for the record to be made at this level." The court observed: "Now, if you had made the request prior to the beginning of jury selection, I guess. . . ." Counsel said: "I had no idea the prosecution would challenge that way, your honor. I didn't want to presuppose that." The court: "Well, now, let's just leave off such sanctimonious statements, . . . The record will speak for itself as to the questions asked and the answers given and you may augment on appeal the nationality or race of the various people excused."

Defense counsel suggested that the prosecutor might be able to assist in augmenting the record. The court responded: "That's what I was just telling you. I'm not going to let two attorneys put in the record something I can't verify, and I have no distinct recollection. . . . I have no recollection and I

will not stand for your categorical statement nor [the district attorney's] categorical statement of how many there are."

In subsequent voir dire, the prosecutor excused another Black woman, Luzinda Perry. The jury as finally selected contained only one Black.*

Responding to the court's suggestion, defense counsel filed an affidavit asserting that on or before the third day of jury selection five Blacks were peremptorily excused by the prosecutor: Marjorie Morrow, Laura Foster, John-Oliver Richardson, Alyce Brown and Margaret Jackson. The judge marked it "filed without court permission and no motion filed. No action taken."

The case was assigned to another judge for trial. Counsel renewed his *Wheeler* motion, but the motion was denied on the ground that it had been previously denied by the judge who heard the voir dire.

██ Defendant now maintains that the court erred in finding that he had not presented a prima facie showing of discriminatory exclusion. His contention raises questions relating to all three elements of a prima facie case as set out in *Wheeler:* the adequacy of the record; the exclusion of a cognizable group; and the likelihood that persons were challenged because of their membership in such a group.

██ With regard to the first element, *Wheeler* requires only that counsel make "as complete a record of the circumstances as is feasible." (22 Cal.3d at p. 280.) It does not require a complete or perfect record. In *Wheeler* itself, we noted that "[n]ot surprisingly, the record is unclear as to the exact number of blacks struck from the jury by the prosecutor: veniremen are not required to announce their race, religion, or ethnic origin when they enter the box, and these matters are not ordinarily explored on voir dire." (P. 263.) Counsel in *Wheeler* "began eliciting from each successive black prospective juror an acknowledgement of his or her race" (*id.*) only "after the People had exercised eight peremptory challenges" (*id.*).[1] Thus *People v. Fuller* (1982) 136 Cal.App.3d 403 [186 Cal.Rptr. 283], described *Wheeler* as a case in which the prosecution "apparently" used seven peremptory challenges to excuse Black jurors. (P. 409, and see *id.* at fn. 2.) And in *People v. Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854], we

---

*The record on appeal did not indicate that one of the jurors was Black, and the parties argued the case before this court on the basis that no Blacks were seated on the jury. Our original opinion relied on this state of the record. After it was published, the parties discovered that a Black woman had served on the jury, and so stipulated to this court. We have modified our opinion accordingly. This modification does not affect our decision of the issues raised by the appeal.

[1] In this respect the present case is an exact parallel; counsel here raised the *Wheeler* issue after the prosecutor had exercised eight peremptory challenges and thereafter established on the record the race of each Black juror.

followed *Wheeler* in a case in which the prosecutor challenged "at least" four Black jurors. (P. 164.)

In our opinion, the record in the present case is adequate to meet the requirement of *Wheeler*. Defense counsel filed an affidavit stating that at the time of his first objection, the prosecution had exercised eight peremptory challenges and excused five Blacks, one man and four women. The discussion on the motion, and the voir dire of the jurors, made it clear that three of these persons—Marjorie Morrow, Alyce Brown and Margaret Jackson— were in fact Black. Neither the prosecutor nor the judge have disputed defendant's assertion that Laura Foster and John-Oliver Richardson were also Black. Voir dire of subsequent jurors shows that the prosecutor exercised additional challenges, striking two other Black jurors, Warren Morris and Luzinda Perry. Thus the record demonstrates with reasonable accuracy that the prosecuting attorney exercised 13 peremptory challenges, and that 7 of those challenges were against Black jurors.

The People point to two respects in which the record is incomplete, but neither is significant. They observe that the record does not establish the race of about 20 challenged jurors, and speculate that some of them may have been Black. If additional Black jurors were challenged by the prosecution, however, that would merely strengthen defendant's case, while the possibility that Black jurors were excused for cause or on peremptory challenge by the defense is irrelevant to the matter.

The People also note that, except for the last two Blacks challenged, defendant did not establish the juror's race by direct question and answer. Appearances may deceive, they suggest; a juror who appears to be Black may not be, and vice versa. But while direct questions on racial identity would help to make a clear and undisputable record, neither *Wheeler* nor any subsequent decision has insisted upon such questions, for good reasons. First, as *Wheeler* recognized (see 22 Cal.3d at p. 263) and as the judge acknowledged in the present case, such questions may be offensive to some jurors and thus are not ordinarily asked on voir dire. Second, counsel is not required to anticipate that the prosecutor will improperly use peremptory challenges to exclude a racial group. Consequently, when a discriminatory pattern begins to emerge, counsel may have to use some other method of establishing the race of jurors who have already been excused. ■ Finally, it is unnecessary to establish the true racial identity of the challenged jurors; discrimination is more often based on appearances than verified racial descent, and a showing that the prosecution was systematically excusing persons who appear to be Black would establish a prima facie case under *Wheeler*.

■ Furthermore, the deficiencies in the record in this case can be attributed in part to the obstructions imposed by the trial judge. Even though

the judge had not kept notes on the race of jurors, it is likely that the prosecutor and defense counsel had notes from which they could reconstruct a record showing the race of the jurors in question. The trial judge, however, refused to invoke the aid of the prosecutor in reconstructing the record, and made it clear that she would not accept even a joint stipulation of counsel as to the race of the jurors. Although the judge invited counsel to augment the record, she made it clear that this augmentation was only for purposes of appeal. When counsel filed an affidavit, moreover, the court did not request a response from the district attorney; she labeled the affidavit "filed without court permission" and indicated that "no action" was taken to reconsider her ruling in light of the augmented record.

When a *Wheeler* motion is made, we believe it to be the duty of the court, and both counsel as officers of the court, to cooperate to construct as complete a record as is feasible. Fortunately, in the present case, despite the lack of assistance from the court, the record is sufficient to establish the critical information. At the time of the first *Wheeler* motion, it shows that the prosecutor had exercised eight challenges, of which four were directed against Black women and one against a Black man, leaving no Blacks on the panel. By the time selection was completed, seven out of thirteen challenges were directed against Blacks (five women and two men), leaving only one Black on the panel. Those facts are sufficient to meet *Wheeler*'s requirement.

We turn to the question whether the persons excluded are members of a cognizable group. That Blacks generally comprise a cognizable group is settled. (See *People* v. *Wheeler, supra,* 22 Cal.3d 258, 280, fn. 26.) Defendant's first motion, however, challenged the exclusion of Black women, and the trial court questioned whether this is any more cognizable a group than toupee wearers.

On this point, we adopt the relevant portion of the dissenting opinion of Justice Clinton White in the Court of Appeal. He wrote that "black women constitute a 'cognizable group.' 'A group to be "cognizable" . . . must have a definite composition . . . there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. . . . There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience. . . .' (*U.S.* v. *Guzman* (S.D.N.Y. 1972) 337 F.Supp. 140, 143-144, affd. (2d Cir. 1972) 468 F.2d 1245, cert. den. (1972) 410 U.S. 937 [35 L.Ed.2d 602, 93 S.Ct. 1397], quoted in *People* v. *Estrata* (1979) 93 Cal.App.3d 76, fn. 7 at p. 90 [155 Cal.Rptr. 731].) Where Blacks comprise a significant portion of the population—particularly in Alameda County where blacks comprise the ma-

jority population in some areas—black women are a vital part of that 'ideal cross-section of the community' that should be represented on jury panels. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277.) They share 'a common perspective arising from their life experience' and their participation on a jury '. . . enhance[s] the likelihood that the jury will be representative of significant community attitudes. . . .' (*People* v. *Harris* (1984) 36 Cal.3d 36, 51 [201 Cal.Rptr. 782, 679 P.2d 433].)

"The trial court's comparison of black women as a cognizable group to 'men who wear toupees' failed to acknowledge the 'concurrence of racial and sexual identity,' (as aptly phrased by defense counsel) which informs the attitudes of this group. This is of special import when we consider the fact that black women face discrimination on two major counts—both race and gender—and their lives are uniquely marked by this combination. When the court asked: 'What function does a black woman fulfill that the white woman doesn't [on a jury]?' the entire thrust of *Wheeler* was overlooked. It is not a question of the merits of one group in contrast to another. At the very core of *Wheeler* is the notion that diversity '[in] beliefs and values [that] jurors bring from their group experiences' must be encouraged in order '. . . to achieve an overall impartiality' in their decision-making processes. (*Wheeler, supra,* 22 Cal.3d at p. 276.) As Justice Marshall observed in *Peters* v. *Kiff* (1972) 407 U.S. 493, 504-504 [*sic*], '[t]he exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases . . . *when any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.* It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that their exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.' (Italics added.) Justice Tobriner in his dissent in *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 110 [154 Cal.Rptr. 734, 593 P.2d 595], insightfully added, 'The subtleties and complexities of human experiences, beyond the court's capabilities of evaluation, constitute the underpinning of the cross-section requirement. We are simply not in a position to make fine judgments as to the fungibility of identifiable segments of the community.' "[2]

 We turn, therefore, to the third element of a prima facie case: a showing of a strong likelihood that the persons in question are being chal-

---

[2]Even if Black women were not a cognizable group, the systematic exclusion of Black women would inevitably result in a disproportionate underrepresentation of Black persons generally on the jury. (See discussion in *People* v. *Fields* (1983) 35 Cal.3d 329, 349-350, fn. 7 [197 Cal.Rptr. 803, 673 P.2d 680].)

lenged because of their membership in a cognizable group. ██ As one method of proving a prima facie case, *Wheeler* noted that the moving party "may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group." (P. 280.)[3] In *Wheeler* itself we found a prima facie case based on a showing that the prosecutor had used seven peremptory challenges to exclude all Blacks from the jury. (Our opinion did not state the total number of peremptory challenges exercised by the prosecutor.) A prima facie case was found in *People* v. *Hall, supra,* 35 Cal.3d 161, 169, when five of eight challenges were used to remove all Black jurors; in *People* v. *Clay* (1984) 153 Cal.App.3d 433, 456 [200 Cal.Rptr. 269], when four of ten challenges removed all Blacks; in *Holley* v. *J & S Sweeping Co.* (1983) 143 Cal.App.3d 588, 590 [192 Cal.Rptr. 74], when three of six challenges removed three out of four Black jurors; and in *People* v. *Fuller, supra,* 136 Cal.App.3d 403, 415, when three challenges were used to remove the only three available Black jurors. ██ The figures in the present case are equally persuasive. At the time of the initial *Wheeler* motion, the prosecutor had used five of eight challenges to remove all Black jurors (or four of eight to remove all Black women jurors). By the close of jury selection he had used seven of thirteen challenges to eliminate Black jurors.

The Attorney General argues that the prosecution's acceptance of the jury on three occasions, when there were one or two Blacks on the panel, rebuts defendant's prima facie showing. (When the prosecutor first passed the jury, it included one Black man, Clarence Owens, who was later stricken by the defense. On the second and third passes, it included both Owens and Jackson. On the fourth pass Jackson was still on the jury.) As explained by Justice White, however, "[t]his contention ignores the practical realities of jury selection and misses the point in *Wheeler.* If the presence on the jury of members of the cognizable group in question is evidence of intent not to discriminate, then any attorney can avoid the appearance of systematic exclusion by simply passing the jury while a member of the cognizable group that he wants to exclude is still on the panel. This ignores the fact that other

---

[3]*Wheeler* suggested other methods of supporting a prima facie showing. First, it noted that the moving party may show that the challenged jurors are largely heterogeneous, with only group membership in common. That analysis applies to the present case, in which the Black jurors struck by the prosecution come from a variety of backgrounds, with varied family and employment histories. Second, *Wheeler* suggested that the failure of the challenging party to engage the jurors in more than desultory voir dire would show his previous plan to remove those jurors. This analysis leads to mixed results; the prosecutor questioned four of the challenged jurors at length but dismissed three others after brief and perfunctory questioning. Finally, defendant's showing gains strength if he is a member of the challenged group, and the victim a member of the group to which a majority of the jurors belong; here defendant was Black, as were the challenged jurors, but the victim was Hispanic while a majority of the jurors were White.

members of the group may have been excluded for improper, racially motivated reasons. In fact, the offending counsel who is familiar with basic selection and challenge techniques could easily accept a jury panel knowing that his or her opponent will exercise a challenge against a highly undesirable juror. If, for instance, three people on the panel exhibit a proprosecution bias, then the prosecutor could pass the jury with at least three members of the group which he ultimately wishes to exclude still remaining on the jury—knowing that he will have a later opportunity to strike them. By insisting that the presence of one or two black jurors on the panel is proof of an absence of intent to systematically exclude the several blacks that were excluded, the People exalt form over substance.''

In summary, defendant raised the *Wheeler* motion in a timely manner, and created as complete a record as was feasible under the circumstances. The challenged group, whether defined as Blacks generally or Black women, is a cognizable group. The prosecutor used a disproportionate number of his challenges to exclude members of a cognizable group. Thus the defendant met each of the *Wheeler* requirements for a prima facie showing of discriminatory exclusion. The court erred in ruling that no prima facie case had been established, and in failing to require the prosecutor to justify his challenges. This error is reversible per se. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 283; see *People* v. *Hall, supra,* 35 Cal.3d 161, 170-171.)

The judgment is reversed.

Bird, C. J., Mosk, J., Kaus, J., Reynoso, J., and Grodin, J., concurred.

LUCAS, J.—I concur in the judgment, but only under the compulsion of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. For the reasons expressed by Justice Richardson in his dissent in that case (22 Cal.3d at p. 288), *Wheeler* was incorrectly decided and should be reexamined.

Respondent's petition for a rehearing was denied October 3, 1985, and the opinion was modified to read as printed above. Lucas, J., was of the opinion that the petition should be granted.