BARKETT, Circuit Judge,
concurring in part and dissenting in part:
*1048 Other than the First Amendment[1] and jury issues, I agree that Ochoa’s arguments would not warrant reversal. However, because the jury selection in this case was so deficient in due process, I believe Ochoa, should be granted a new trial. Specifically, I think that after empaneling an anonymous jury, the district court inexplicably failed to take the simple precautionary measures that would have been adequate to protect Ochoa’s presumption of innocence or his right to an impartial jury as required by United States v. Ross, 33 F.3d 1507, 1520 (11th Cir.1994). Additionally, I believe the jury selection process violated the dictates of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and Johnson v. California, — U.S. —, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005).

1. Anonymous Jury

Recognizing that jury anonymity “is a drastic measure ... which should be undertaken only in limited and carefully delineated circumstances,” the guidelines in Ross limit the circumstances in which a court can empanel an anonymous jury. Ross, 33 F.3d at 1519. These guidelines contemplate that a court must do more than it ordinarily would to protect a defendant’s presumption of innocence and right to an impartial jury by “taking reasonable precautions to minimize any prejudicial effects on the defendant .... ” Id. at 1520 (emphasis added). The majority opinion concludes that the voir dire in this ease, which made no mention or inquiry regarding either the jury anonymity or the unusual security measures taken, together with the standard jury instructions, was sufficient to meet the “reasonable precautions” requirement. I disagree. The voir dire and jury instructions under the circumstances presented here, even in combination, fall short of the requirements of Ross, and the majority opinion eviscerates the protective measures that Ross requires in order to address the grave concerns posed by any extraordinary measures such as, additional security and juror anonymity.
There is no question that, in the context of an anonymous jury, voir dire protects a defendant’s presumption of innocence os well as his right to an impartial jury. Id. at 1520. By drawing a rigid distinction between the two concerns raised by jury anonymity — the risk that it will impinge upon a defendant’s Sixth Amendment right to an impartial jury by inhibiting the meaningful exercise of peremptory challenges and the risk that it will damage a defendant’s presumption of innocence by “rais[ing] the specter that the defendant is a dangerous person from whom the jurors must be protected,” id. at 1519 — the majority opinion finds that the requirements of Ross have been satisfied in this case. This conclusion rests on the untenable *1049 premise that voir dire is “not ... a means of investigating the potential effect of anonymity on the jurors’ ability to presume the defendant innocent.” Majority Op. at 1037. In fact, a measure that threatens a defendant’s right to a presumption of innocence also necessarily threatens his right to an impartial jury. If jury anonymity has instilled in jurors the perception that a defendant is dangerous — thereby affecting his presumption of innocence — it has also affected his right to an impartial jury. Thus, to the degree that voir dire is the appropriate way to uncover juror bias, it is necessarily the appropriate way to uncover bias that arises from juror anonymity itself. Both the cautionary instruction and the thorough voir dire discussed in Ross must therefore be understood to safeguard both the presumption of innocence and the right to an impartial jury.
In a case like this, where the defendant may have waived a cautionary instruction,[2] voir dire becomes exceptionally important, as it is the primary means of safeguarding both of these rights. When we held in United States v. Bowman, 302 F.3d 1228 (11th Cir.2002), that a defendant waives any right to a cautionary instruction by failing to request one, we took care to note that voir dire had been “thorough,” and as a result, “the parties knew everything about the jurors except their names.” Id. at 1236 n. 1.
In other cases where defendants have failed to ask for a cautionary instruction, courts, while denying relief, have emphasized that voir dire counteracted the lack of an explanatory instruction to anonymous jurors. In United States v. Vario, 943 F.2d 236 (2d Cir.1991), the Second Circuit held that the defendant had waived his right to an explanatory jury instruction by failing to request one. Id. at 241. Nonetheless, the Second Circuit held that the district court had adequately protected the defendant’s rights by “fully instruct[ing] the jurors on the presumption of innocence” and “conducting] a searching voir dire which sufficiently enabled [the defendant] to exercise his challenges meaningfully and to obtain a fair and impartial jury.” Id. at 241-42.
In United States v. Mansoori, 304 F.3d 635 (7th Cir.2002), the Seventh Circuit found that a defendant’s rights were adequately protected even though the court provided no explanation for jurors’ anonymity, because the court “conducted an extremely thorough voir dire ... over the course of three and one-half days”[3] and emphasized the presumption of innocence and the government’s burden of proof in its instructions. Id. at 652. The court specifically noted that “[t]he defendants have identified no aspect in which the district court’s voir dire was wanting .... ” Id.
Here, however, .Ochoa did identify an “aspect in which the district court’s voir dire was wanting” and tried to address it. He expressly sought to determine whether the extreme security precautions, including the anonymity of the jurors, impaired any juror’s ability to be neutral. However, the district court did not permit either defense lawyers or the government to ask questions on this topic. Nor would the trial court include these topics in its own voir dire questions. I believe this violated both' *1050 Ochoa’s Sixth Amendment and due process rights. Even though “[t]he Constitution ... does not dictate a catechism for voir dire,” Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), a court can abuse its discretion by failing to question prospective jurors on certain relevant topics. For example, the Constitution requires voir dire on topics of racial prejudice, attitudes toward the death penalty, and exposure to pre-trial publicity when those issues are relevant to the trial. See Ham v. South Carolina, 409 U.S. 524, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) (holding that “the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that ... the petitioner be permitted to have the jurors interrogated on the issue of racial bias” where the defendant was African-American and alleged that his arresting officers had framed him in retaliation for his civil rights activities); Morgan, 504 U.S. at 735-36, 112 S.Ct. 2222 (holding that a defendant facing the death penalty must be allowed to question jurors to determine whether any would automatically impose the death penalty if the defendant were found guilty); Jordan v. Lippman, 763 F.2d 1265, 1281-82 (11th Cir.1985) (holding that the Sixth and Fourteenth Amendments required voir dire to determine whether jurors had been exposed to extensive pre-trial publicity when a controversial protest directly relating to the trial took place the weekend before trial).
The same reasoning that requires voir dire to reveal juror bias in these situations also requires voir dire to uncover bias caused by jury anonymity, as jury anonymity is also recognized to pose a significant threat to a defendant’s presumption of innocence and right to an impartial jury. See Ross, 33 F.3d at 1519-20; United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir.1994) (“In deciding whether the district court properly granted a sequestered and anonymous jury, we must balance the defendant’s interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against the jury member’s interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict.”). In our cases addressing pre-trial publicity, we have explicitly outlined a minimum scope of voir dire required to protect the defendant’s right to an impartial jury. Those guidelines apply equally to the circumstance of an anonymous jury. In United States v. Davis, 583 F.2d 190 (5th Cir.1978),[4] which arose out of an armed attempt to free Americans detained in a Mexican jail on drug charges, the district court determined that all of the potential jurors had heard about the highly-publicized facts of the case. Id. at 196. During voir dire, the court asked the panel as a whole “if [they] felt the publicity impaired [their] ability to render an impartial decision.” Id. No one responded, and the court rejected defense counsel’s request for individual questioning on the subject. Id. The former Fifth Circuit found that this constituted an abuse of discretion:
Under the circumstances of this case, where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough. The court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for *1051 itself whether any juror’s impartiality had been destroyed.
Id. (emphasis added).
In Jordan, a controversial demonstration directly relating to the case took place near the courthouse and received extensive media coverage. 763 F.2d at 1270-71. After the demonstration, defense chunsel sought “additional and individualized voir dire to enable him to uncover any prejudice which may have resulted from the events,” but the district court refused. Id. at 1271. Relying on Davis, we found that “[a]t the least, there was a ‘significant possibility of prejudice’ which arose from the coverage of the protest and the protest itself when coupled with all that had come before it.” Id. at 1279. In addition, we found that “[t]he voir dire engaged in after the events of the weekend ... was not merely inadequate, it was nonexistent.” Id. at 1281. We concluded that the voir dire was insufficient to protect Jordan’s rights because the jurors “were subject to a significant possibility of prejudice while ... Jordan was not given an opportunity to uncover such prejudice.” Id. at 1281-82. We held that at a minimum, “where there exists a significant possibility of prejudice the jurors must in the first instance be questioned as to whether they were exposed. Further inquiry as to the nature of the exposure is then undertaken, if necessary.” Id. at 1281.[5]
The empanelment of an anonymous jury and the use of extraordinary security measures pose the same significant possibility of juror prejudice as racial prejudice, attitudes toward the death penalty, and exposure to pre-trial publicity. Thus, I believe that a similar constitutional requirement for specific voir dire also applies in the context of anonymous juries. Under Ross, at a minimum, the court should have granted Ochoa’s request that the jurors be questioned regarding their response to the security measures so that counsel could make an informed decision as to their bias.[6]

2. Batson Challenge

I also disagree with the majority that Ochoa’s claim that the prosecution’s use of its peremptory strikes violated Batson, 476 U.S. at 79, 106 S.Ct. 1712, “lacks merit as a matter of law.” Majority Op. at 1047.
Ochoa’s Batson claim rested on allegations that the prosecution engaged in a discriminatory “pattern” of strikes against five Hispanic venire members.[7] The pros *1052 ecution offered a non-discriminatory basis for two of the strikes, but insisted that Ochoa could not establish a prima fade case of discrimination because the anonymity of the jurors precluded a conclusive determination of their ethnicity.[8] Identifying the Hispanics on the venire, the government argued, was a necessary prerequisite to discriminating against them. However, the trial court refused to disclose the racial and ethnic information the venire members had reported on a jury questionnaire prior to voir dire.[9] Ochoa’s counsel asserted that, nonetheless, both he and the prosecution could tell which jurors were Hispanic from their appearance and voices. Indeed, although the prosecution vigorously denied that it could discern the ethnicity of the stricken jurors, it stated at voir dire that it “noticed two of the jurors impaneled as alternates or as jurors in this case do have Spanish accents,” and that a juror it had accepted “appears to talk with an accident [sic] that would indicate a Hispanic background.” Thus, it could discern that some jurors were Hispanic.
Despite the defense’s assertion and the prosecution’s admissions that Hispanic jurors could be, and had been, identified by sight and sound, the district court refused to consult the completed jury questionnaires or ask the stricken jurors to identify their ethnicity on the record to determine whether Ochoa had established a prima fade case of discrimination. Instead, without permitting counsel to conclusively establish the ethnicity of the jurors, and without making any factual determinations in that regard, the trial court orally ruled that Ochoa had failed to make out a prima fade Batson claim:
THE COURT: I don’t know how you arrive at the determination of what the ethnic makeup of the jury is.
MR. BLACK:[10] By looking at them.
THE COURT: I don’t know that you can look at people and tell where they are from.
MR. BLACK: Then I would ask the Court to ask them.
THE COURT: I don’t know that that’s my burden.
MR. BLACK: Then I would ask permission to ask them.
THE COURT: But I don’t think you have made — you have made what is an unsupported allegation. You are the one making it, not me.
MR. BLACK: But Your Honor does not allow us to have a questionnaire, to *1053 ask the questions, so I have to go with what I can. All.I can do is see and listen.
THE COURT: What is it that — what power do you have? I would like to have that, look at people and know.
MR. BLACK: I will tell you exactly. I have lived in Dade County for well over 40 years. I can tell by the accents of their voices. We listened to people speaking, so we could tell which were Hispanic and which weren’t. We can look at what their facial features are and their skin color. And it is pretty obvious to me that the judgments that they made are correct. We have eight African Americans. That’s pretty obvious to make a judgment on. And I would ask if the Court has any question, let’s put on the record and have the people state whether they are African American, white American, Hispanic.
MR. DEL TORO:[11] The prosecution team has not been able to determined [sic] the ethic [sic] background of the juror who is a photographer [juror 379] because he did not have any kind of an accent, spoke standard English, didn’t appear clearly to be Hispanic. I have noticed two of the jurors impaneled as alternates or as jurors in this case do have Spanish accents, and they are both males.
Of course the government is not excluding male Hispanics from this jury. The mere fact that someone manages to make it in doesn’t have anything to do with the Batson challenge.
MR. BLACK: I’m glad the government agreed that you could tell the Hispanic accent, so the government has joined me.
MR. DEL TORO: I said the only one— I could tell the two on the panel, the opposite of the Batson challenge, did not have discernable accents. He[12] spoke standard American English.
MR. RYAN:[13] If I could interrupt? This morning Mr. Black asked that the jurors stricken by the government, that their.records be preserved. I would ask that all the jurors’ records be preserved. I think it supports us.
THE COURT: All right.
MR. BLACK: I support that.
THE COURT: Do I need to say denied?
MR. BLACK: Yes. Thank you.
THE COURT: Thank you.
(D.E.1468, 86-88.)
After trial, the district court supplemented the record with the racial and ethnic information from the jury questionnaires. Rather than supporting the government this information, available at the time of voir dire, confirmed that all five of the allegedly Hispanic jurors stricken by the prosecution were in fact Hispanic.
Despite the “great deference” we give to the district court’s finding as to the existence of a prima facie Batson case, “[t]he application of the equal protection principles enunciated in Batson to the exclusion of [a particular racial or ethnic group] from a jury is an issue of constitutional law that is subject to plenary review.” United States v. Allen-Brown, 243 F.3d 1293, 1296 (11th Cir.2001). Indeed, as the Supreme Court has now twice reminded us, “deference does not by definition preclude relief.” Miller-El v. Dretke, — U.S. —, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196, (2005) (quoting Miller-El v. Cockrell, 537 *1054 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)) (internal marks omitted).[14]
To prove a Batson violation, the party challenging the use of peremptory strikes “must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.” Johnson, 125 S.Ct. at 2416 (internal quotation marks omitted). The Supreme Court recently emphasized that the objecting party’s burden in establishing a prima facie Batson case is one of production and not of persuasion. Id. at 2417-18 & n. 7. It also made clear that although the burden of production requires the objecting party to produce facts supporting an inference of discrimination, that inference need not be the most likely one possible, or even one that is more likely than not correct, but instead need only be one conceivable inference among many:
We did not intend [Batson’s] first step to be so onerous that a defendant would have to persuade the judge — on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of Batson’s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.
Id. at 2417 (emphasis added) (internal quotation marks omitted).
As noted in the majority opinion, the Supreme Court in Batson enumerated two examples of circumstances that may support an inference of impermissible discrimination: (1) if a party engages in a “pattern” of strikes against venire members of a particular race, or (2) if a party makes statements or asks questions during voir dire or in exercising challenges suggesting that its strikes have a discriminatory purpose. Batson, 476 U.S. at 97, 106 S.Ct. 1712; Central Ala. Fair Housing Ctr. Inc. v. Lowder Realty Co., 236 F.3d 629, 636 (11th Cir.2000). In cases where a Batson challenge only alleges an impermissible “pattern” of strikes against venire members of a particular race, a challenge rate significantly greater than the minority percentage of the venire strongly supports a prima facie Batson claim. Central Ala. Fair Housing Ctr., 236 F.3d at 637 (citing United States v. Alvarado, 923 F.2d 253, 255 (2d Cir.1991), in which the court held that a challenge rate 172% greater than *1055 the estimated minority percentage of the venire established a prima facie case of discrimination). In this case, Ochoa alleged that the prosecution had used 83.3% of its strikes — five of six — to eliminate Hispanics from the venire. A challenge rate of 83.3% strongly supports a prima facie Batson claim in cases involving all but the most Hispanic-dominated venire panels.[15]
Accordingly, the merits of Ochoa’s pri-ma facie ease rested on a statistical comparison of the percentage of strikes used to eliminate Hispanic jurors to the percentage of Hispanics on the venire.[16] The burden of establishing facts sufficient to support a prima facie case of discriminátion rests on the moving party. Central Ala. Fair Housing Ctr., 236 F.3d at 636.
However, the district court specifically blocked Ochoa from obtaining the necessary ethnic information to support his potentially meritorious claim by: (1) adopting juror anonymity measures that hid the ethnicity of the venire from the litigants; (2) precluding Ochoa from accessing the jury questionnaires; and (3) refusing to question the jurors directly about their ethnicity or to allow Ochoa to do so — and thus made it impossible to conclusively resolve the merits of Ochoa’s claim.
As important as juror anonymity measures may be, they cannot be permitted to *1056 defeat jurors’ and litigants’ rights under the Equal Protection Clause, especially since there can be no security risk in granting access to self-reported racial information to litigants (if not to the public).[17] Without this basic information, a litigant could almost never establish a prima facie case of racial discrimination based on a “pattern” of jury strikes, since that showing will usually rest upon a statistical analysis of the venire’s racial composition. See Central Ala. Fair Housing Ctr., 236 F.3d at 636-37. And, as the record reveals, the only alternative to identifying the self-reported race or ethnicity of the venire members is to establish it based on appearance, demeanor, voice, and other physical characteristics — thereby perpetuating the same invidious stereotyping in jury selection that our Batson jurisprudence seeks to eliminate. See, e.g., J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127, 140, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (“The community is harmed by the State’s participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.”).
In short, in order to evaluate the merits of Ochoa’s Batson claim in light of the juror anonymity measures and restrictions on voir dire, and thereby comply with Central Alabama Fair Housing Center’s mandate to “examine whether the [moving] party has shown sufficient ‘relevant circumstances’ to raise an inference that the opposing party seeks to exclude [] prospective juror[s] on account of race,” 236 F.3d at 636, the district court had to permit Ochoa to identify which venire members were Hispanic and which were not. Yet that is exactly what the district court refused to do. Instead, it ruled that Ochoa could not make out a prima facie case because he could not produce the very ethnic information it had precluded him from obtaining. In so doing, I believe the district court misapplied “the equal protection principles enunciated in Batson,” Allen-Brown, 243 F.3d at 1296, and committed reversible error.
In addition, the district court’s refusal to consult or release the jurors’ self-reported racial information until after trial — information that it recognized was “crucial to [Ochoa’s] Batson claim” (D.E.1552, 1)— subjected the determination of whether Ochoa had made out a prima facie case to impermissible judicial speculation about the venire’s racial makeup. See Johnson, 125 S.Ct. at 2418-19 (holding that it violated Batson for a state court to speculate about plausible race-neutral reasons for striking jurors in determining whether the defense had made out a prima facie case under People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), and noting that “[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question”). Moreover, the district court’s refusal to release the racial data during voir dire needlessly deferred any inquiry *1057 into the prosecution’s motives to some later date, when the passage of time and impermissible hindsight bias might cloud any proffered race-neutral reasons for the strikes. See Miller-El v. Dretke, 125 S.Ct. at 2326 n. 1 (noting that evidence presented at a Batson hearing conducted two years after trial “was subject to the usual risks of imprecision and distortion from the passage of time”) (internal quotation marks and citation omitted); id. at 2328 (refusing to credit a race-neutral explanation offered by the prosecution that “reek[ed] of afterthought”).[18]
I am also unconvinced by the government’s argument that it could not have violated Batson because it did not know the self-reported ethnicity of the prospective jurors at the time it exercised its peremptory strikes.[19] Litigants do not need to know the self-reported race or ethnicity of a juror to violate Batson. Rather, the Supreme Court recognizes that litigants can and will discriminate during the jury selection process based on venire members’ appearances, demeanor, and voices, and not simply on the basis of their self-reported race. See Batson, 476 U.S. at 129-30 & nn. 10-11, 106 S.Ct. 1712 (Burger, C.J., dissenting) (noting that “[the Batson] Court states as fact that ‘a jury composed only of white persons was selected’ ” solely on the basis of the prosecutor’s statement that “[in] looking at them, yes; it’s an all-white jury” and noting the possibility that the “proper inquiry [under Batson] concerns not the actual race of the jurors who are excluded, but rather counsel’s subjective impressions as to what race they spring from”); id. at 96, 106 S.Ct. 1712 (“[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.”) (internal quotation marks omitted); Miller-El v. Dretke, 125 S.Ct. at 2341 (Breyer, J., concurring) (noting that racial bias in the jury selection process can be automatic, unconscious, and unintentional); Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 628, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (“To permit racial exclusion in [the jury selection process] ... compounds the racial insult inherent in judging a citizen by the color of his or her skin.”); Hernandez v. New York, 500 U.S. 352, 371-72, 111 S.Ct. *1058 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) (“[A] policy of striking all who speak a given language, without regard to the particular circumstances of the trial or the individual responses of the jurors, may be found by the trial judge to be a pretext for racial discrimination.”); see also People v. Motton, 39 Cal.3d 596, 217 Cal.Rptr. 416, 704 P.2d 176, 180 (1985) (addressing improper racial discrimination through the use of peremptory strikes under People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), and stating that “it is unnecessary to establish the true racial identity of the challenged jurors; discrimination is more often based on appearances than verified racial descent, and a showing that the prosecution was systematically excusing persons who appear to be Black would establish a prima facie case under Wheeler”).[20]
For the foregoing reasons, I believe that Ochoa is entitled to a new trial by an impartial jury selected in accordance with the Equal Protection and Due Process Clauses of our Constitution.

. Additionally, although I certainly agree with the propriety of using our supervisory powers to remind the district court that it must comply with the dictates of United States v. Valenti, 987 F.2d 708 (11th Cir.1993), I also think that the constitutionality of its docketing procedures was properly before us as an issue on appeal. The majority notes that " [b]ecause the district court's orders unsealing dockets here brought them in compliance with Valenti, the secret-docketing issue is not properly before us.” Majority Op. at 1030. However, this is precisely the procedural posture in Valenti, in which the district court had used unconstitutional secret docketing procedures, but entered an order prior to the appeal requiring the clerk "to annotate any further closed proceedings in this case on the Middle District’s public docket ....” Valenti, 987 F.2d at 711. The Valenti Court recognized that this order "moot[ed] that portion of this case relating to the district court's procedures for closure and its maintenance of a dual-docketing system,” but nonetheless heard the claim on its merits because it "presented] a controversy capable of repetition yet evading review.” Id. at 712.

. Ochoa’s adamant argument against a cautionary instruction did not occur at trial, but rather in the context of his opposition to the government's motion to empanel an anonymous jury, when he contended that any precautionary measures the court might take would be ineffective. (D.E.982.) Nonetheless, he did not request a cautionary instruction at any point during trial proceedings.

. In this case, by contrast, the entire voir dire was completed in less than one day.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

. Moreover, Jordan made it clear that the voir dire requirements set out in Davis and Jordan were derived from constitutional requirements, and not based on our supervisory powers. See Jordan, 763 F.2d at 1278 & n. 15.

. There is no support for the majority’s proposal that the "generally accepted practice” is to "downplay ... the significance of the juror anonymity procedure.” Majority Op. at 1036. While I acknowledge that at some point emphasis on jury anonymity, particularly in the form of a cautionary instruction, may itself create problems of prejudice, the type of safeguards Ross proposes — the cautionary instruction and thorough voir dire — suggest that the court must do more than it would in the course of an ordinary trial to address the particular hazards presented by jury anonymity.
Furthermore, the majority notes that the district court "instruct[ed] the jury repeatedly and at length about the presumption of innocence,” majority op. n. 28, but there is nothing in this record that distinguishes these jury instructions, either in length, time, or frequency, from those generally given at the beginning and end of every criminal trial. Thus, I do not believe that such instructions satisfy Ross’s requirement that a court do more than is ordinarily required to protect a defendant’s presumption' of innocence under the circumstances present here.

.Specifically, Ochoa challenged the strikes of jurors 51, 221, 234, 379, and 124. (D.E.1468, 85.)

.I have used "ethnicity'' or "ethnic identity” to describe a juror's Hispanic origin wherever possible, but in some instances the case law refers to a juror’s Hispanic "race.” However, the Supreme Court appears to use "race” and "ethnicity” interchangeably in the Batson context, at least when discrimination against jurors of Hispanic or Latino origin is at issue. See United States v. Martinez-Salazar, 528 U.S. 304, 315, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) ("Under the Equal Protection Clause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race.”). Compare Hernandez v. New York, 500 U.S. 352, 355, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) (stating that a Batson violation would occur if "the prosecutor in [the petitioner’s] criminal trial exercised peremptory challenges to exclude Latinos from the jury by reason of their ethnicity”), with id. at 372, 111 S.Ct. 1859 (O'Connor, L, concurring in the judgment) ("In order to demonstrate [a Batson] violation, Hernandez must prove that the prosecutor intentionally discriminated against Hispanic jurors on the basis of their race.”).

. The district court made no findings with respect to these explanations, other than to acknowledge that they had been offered, nor did it indicate whether it believed the government’s argument that it could not tell if the stricken jurors were Hispanic.

. Ochoa's counsel.

. Counsel for the government'.

. Presumably juror 379.

.Counsel for the government.

. The majority correctly notes that "we give great deference to a district court’s finding of whether a prima facie case of impermissible discrimination has been established,” and cites our decision in Allen-Brown, 243 F.3d at 1296-97, for the proposition that "[a] district court's finding as to why a juror is excused is an issue of fact, and as such, it will not be disturbed on appeal unless it is clearly erroneous or appear to have been guided by improper principles of law.” This case, however, is one in which the district court was guided by "improper principles of law.” By refusing to permit the defendant to put the pertinent facts relating to the juror's ethnicity on the record, the court misapplied the law of Batson.
Furthermore, the majority also notes that "[w]hile Ochoa's attorney did correctly determine at trial that the five struck jurors were Hispanic, he himself at trial misidentified five other Hispanic jurors when he indicated that the jury contained only one Hispanic juror. In fact, six Hispanics were empaneled as jurors or alternates. We must therefore defer to the district court’s finding of fact that one could not identify Hispanic jurors in this particular case simply by their appearance and accent.” This deference is not warranted, however, because it mischaracterizes what the court did as a fact-finding determination, when in fact the district court specifically avoided making such a determination. The record is devoid of any finding by the district court that one could not identify Hispanic jurors. Instead, the majority cobbles together comments which it construes as such a finding. See majority op. n. 36.

. In fact, the juror records indicate that of the 82-member venire, 44 (or approximately 52%) identified themselves as Hispanic. (The Hispanic ethnicity of two black jurors is listed as "UNK,” which I understand to represent "unknown.” I do not count these two jurors as Hispanic, but if one did include them, Hispanics would have composed about 56% of the venire.) Thus, the challenge rate was slightly more than 154% of the minority percentage of the venire, a disparity significant enough to "strongly support” a prima facie Batson claim under Central Alabama Fair Housing Center, especially because the challenge rate in this case could not have exceeded 185% of the minority percentage of the venire. Moreover, Ochoa was "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.” Batson, 476 U.S. at 96, 106 S.Ct. 1712 (internal quotation marks omitted).

. The majority says that "[e]ven if we adopted the dissent's unsupported view that the government could determine the ethnicity of potential jurors, we would still reach the same result here because, as a matter of law, Ochoa failed to establish a prima facie case under Batson. In that regard, we note that the district court denied his challenge without determining whether there was a sufficient ‘pattern’ of strikes by the government to create an inference of discrimination. But the record on appeal contains the necessary statistical information for a thorough prima-facie-case analysis, which we will now undertake.” Majority Op. at 1043-44. As the majority recognizes, it is the district court's job in the first instance to make the prima facie case determination. And the Supreme Court in Johnson clarified that "inferences that discrimination may have occurred [are] sufficient to establish a prima facie case under Batson." Johnson, 125 S.Ct. at 2419. Here, Ochoa’s statistical analysis clearly creates an inference of discrimination. Indeed, the majority errs in how it conducts the Batson statistical analysis: it does not conduct the analysis at the time the objection was raised, but only after juiy selection was completed. At the time Ochoa first raised his Batson objection, the government had used four of its peremptory strikes, all of them against Hispanics. This 100% strike rate against Hispanics would seem to present a "substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury,” which was 52% in this case. Central Ala. Fair Housing Ctr. 236 F.3d at 637. And while our precedents point out that the making of a prima facie case cannot "ordinarily” rest on numbers alone, id. ("A party advancing a Batson argument ordinarily should 'come forward with facts, not just numbers alone.’ "(citation omitted)), the district court's refusal to allow Ochoa to access information that would have allowed him to make a Batson challenge is far from “ordinary.”

. Indeed, I see no reason to keep racial information about anonymous jurors sealed at all. Ochoa's Batson challenge could have been easily resolved but for the anonymity measures. Moreover, if the litigants know the self-reported race or ethnicity of the jurors before voir dire, the district and appellate courts will not be faced with the thorny question of whether the litigants could discern the race of the jurors by observation alone. This is not an easy task in many cases, such as when a party strikes so-called "light-skinned blacks” or "mulattos” from the venire. And if the court errs in its racial assessment, it risks adding insult to the discriminatory injury the stricken jurors may already have suffered.

. Judicial speculation into the prosecution's reasons for striking a juror is prohibited at any stage in the Batson analysis. See Johnson, 125 S.Ct. at 2418-19; Miller-El v. Dretke, 125 S.Ct. at 2331-32 ("[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.”) (internal citations omitted).

. The majority suggests that this position involves fact-finding. Majority Op. at 1042 ("Neither is the dissent in a position to fact-find to the contrary here ....”). But observing that the district court refused to make a finding when the defendant pointed out that the struck jurors looked Hispanic and spoke with a Hispanic accent is not fact-finding. It is pointing out that the district court avoided finding facts on this issue. The majority contests this interpretation, but by construing a series of questions by the district court to both Ochoa’s counsel and the United States as a "basis” for denying Ochoa’s Batson challenge, it is the majority that is engaging in unwarranted inferences.

. Cf. Stephens v. State, 884 So.2d 1071 (Fla.Dist.Ct.App.2004) (holding that when a criminal defendant had made out a prima facie case of discrimination regarding the prosecution’s strike of an ostensibly African-American juror under Melbourne v. State, 679 So.2d 759 (Fla.1996), the fact that the prosecutor "did not know the prospective juror’s race” did not constitute, by itself, a race-neutral explanation for the strike under Florida law).