Filed 7/19/16  P. v. Hernandez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JESSICA HERNANDEZ et al.,<br><br>　　Defendants and Appellants. | B257026<br><br>(Los Angeles County<br>Super. Ct. No. MA057270) |

　　APPEAL from judgments of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Conditionally reversed and remanded as modified as to appellant Jessica Hernandez.  Affirmed in part and reversed in part as to appellant Jose Lopez.

　　Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Jessica Hernandez.

　　Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant Jose G. Lopez.

　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jessica Hernandez and Jose Lopez appeal from judgments entered after dual juries[1] found them guilty of kidnapping to commit robbery and carjacking, and found firearm and other enhancement allegations to be true. Lopez's jury also found him guilty of robbery and burglary. The trial court sentenced Hernandez to life plus two years in prison, and Lopez to life plus 16 years in prison.

Hernandez contends the trial court erred (1) in denying her *Batson/Wheeler*[2] motion and (2) in failing to instruct sua sponte on attempted kidnapping to commit robbery. We reject her latter contention but agree the court erred in denying her *Batson/Wheeler* motion based on a finding she did not make a prima facie showing of group bias in the prosecution's exercise of a peremptory challenge. We conditionally reverse the judgment against Hernandez and remand the matter to the trial court for further proceedings on her *Batson/Wheeler* motion.

Lopez contends the trial court erred (1) in admitting evidence of a prior, uncharged bank robbery and (2) in imposing a one-year sentence enhancement under Penal Code section 12022.6, subdivision (a)(1), where the jury did not make the requisite finding defendants took more than $65,000 in the charged bank robbery. We reject his former contention but agree the court erred in imposing the enhancement. Accordingly, we reverse and strike the enhancement.

## BACKGROUND

In December 2008, Lopez and Hernandez robbed a branch of Downey Savings Bank. In January 2011, Lopez robbed a U.S. Bank branch.

**Prosecution Evidence**

In the evening on December 1, 2008, Hernandez and Lopez surreptitiously entered Judy Stoffer's garage after Stoffer returned home from her job at Downey Savings Bank.

---

[1] The prosecution tried Hernandez and Lopez together, but each defendant had a separate jury.

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

Lopez, who was wearing a ski mask, confronted Stoffer about an hour later when she returned to the garage to retrieve something from her car. He grabbed her around the neck from behind and placed a gun to her head. Lopez asked if she was the manager of the bank and Stoffer responded affirmatively. Lopez pushed her to the ground and continued to point the gun at her. Stoffer could hear another person moving in the garage. Lopez instructed the person to enter the house, and Stoffer heard someone go inside. Lopez told Stoffer they were going to rob the bank. Stoffer explained the vault was locked for at least 12 hours. Lopez understood and said they would go to the bank in the morning. He forced Stoffer into her house at gunpoint. Eventually, she saw the other person, a woman wearing a ski mask (Hernandez).

To ensure Stoffer's cooperation, Lopez told her (unidentified) people had taken her son hostage and would kill her and her son if she refused to cooperate. Stoffer believed Lopez's representations because he presented accurate information about her son's whereabouts the prior weekend. Lopez made two telephone calls in the morning, during which he indicated Stoffer was cooperating so the people should leave her son alone. After the second call, Lopez told Stoffer he understood how she felt because the same people had taken his own 14-year-old daughter hostage to ensure he would commit the bank robbery. He also claimed Hernandez was with him to make sure he followed through with the plan. Hernandez was not present when Lopez made this comment or the phone calls. Hernandez spent the night in the guest room, while Lopez stayed with Stoffer in her bedroom, pointing a gun at her head.

Stoffer believed Lopez was knowledgeable about banks because he used proper banking terminology. Throughout the night, he made inquiries about bank procedures, such as if the bank used "exploding dye packs" or "bait money." Stoffer assured him she would separate the bait money from the cash she gave him, and explained Downey Savings Bank did not use dye packs. Lopez asked how much money Stoffer could access and she told him about $100,000.

In the morning, Lopez took Stoffer to the garage and directed her to start her car. Then he ordered her to get in the backseat, recline the seat, lie back, and close her eyes.

3

She complied. He threatened to kill her if she opened her eyes. He was sitting next to her in the backseat with the gun pointed at her. She did not believe anyone outside looking in would be able to see her because she was lying nearly flat.

Hernandez entered the car and sat in the driver's seat. Lopez ordered Stoffer to open the garage door and she did. They drove away. The car stopped at Downey Savings Bank, less than a mile from Stoffer's house.[3]

Lopez ordered Stoffer to exit the car and take him inside the bank. It was early morning and no other employees were present. Stoffer unlocked the front door, disarmed the alarm on the vault, and unlocked the cabinet containing the cash drawers. Stoffer knew there was about $110,000 in her cash drawer. While Lopez pointed the gun at her, she removed the money from the drawer, separated the bait money ($100), and placed the remaining cash in a bag for Lopez. He also ordered her to empty her working cash drawer which contained only small bills.

Lopez and Stoffer returned to the car. Hernandez drove them back to Stoffer's house. Lopez ordered Stoffer into the house at gunpoint. After Lopez and Hernandez left, Stoffer dialed 911.

Three years later, in January 2011, Lopez robbed a U.S. Bank branch. He entered the bank, approached a teller (Jaqueline Zettino), and asked for the assistant manager by name (Norma). Lopez handed Zettino a piece of paper and indicated Norma's address was written on the paper. He told Zettino people were holding Norma's husband and daughter hostage. Looking out the bank window, he pointed out which car in the parking lot was Zettino's and the other teller's, and stated he knew Norma rode with someone to work. Lopez asked Zettino for money. She handed him the money from her cash drawer. He rejected it, saying it was not enough and the person who sent him would kill him if he did not bring back enough money. After repeated requests for additional money, Lopez accepted the cash Zettino gave him and eventually exited the bank.

---

[3] In his defense case, Lopez testified the bank was two blocks from Stoffer's house.

4

The Los Angeles Police Department determined Lopez and Hernandez were persons of interest in both the Downey Savings Bank and U.S. Bank robberies. After further investigation, including the execution of a search warrant at a residence Lopez and Hernandez shared, officers arrested Lopez. During an interrogation, Lopez initially denied involvement in either robbery, but eventually confessed he participated in both. He claimed a man named Harvey forced him to commit the U.S. Bank robbery to repay a debt. Lopez represented he had borrowed money from Harvey to pay rent. Harvey instructed him on how to commit the robbery. Lopez gave Harvey the money from the robbery, which was not enough to cover the debt. Lopez claimed a man named L.T. planned the Downey Savings Bank robbery. L.T. threatened to tell the police Lopez was involved in a bank heist if Lopez refused to participate. DNA from an earring officers found in Stoffer's abandoned car and from discarded clothing officers found in a neighborhood near U.S. Bank matched Lopez's DNA profile.

Officers also interrogated Hernandez. She admitted she participated in the Downey Savings Bank robbery with Lopez. She claimed a man named L.T. threatened to tell the police she and Lopez had committed an earlier Wells Fargo Bank robbery if they failed to cooperate in this robbery. Hernandez decided to participate in the Downey Savings Bank robbery because she needed money to pay for her daughter's medical treatment.[4] Hernandez stated she did not receive any of the proceeds from the robbery, however, because L.T. and Lopez split the money.

**Defense Evidence**

Lopez testified in his defense.[5] He claimed he committed the Downey Savings Bank robbery under duress. L.T., a man with whom he had socialized, orchestrated the kidnapping of his 12-year-old stepdaughter and one-year-old daughter to force his cooperation in the robbery. Lopez denied Hernandez participated in the Downey Savings

---

[4] This child is not Lopez's daughter.

[5] Hernandez's jury heard the portions of Lopez's testimony relevant to her case.

Bank robbery.  He was not dating her at that time.  He stated an unidentified woman wearing a ski mask was inside Stoffer's house when L.T. dropped him off there.  The woman gave Lopez instructions and provided him with a plastic toy gun.  The next morning, after the robbery, Lopez turned over the bag of money to L.T., and L.T. allowed him to pick up his daughters from the house where L.T.'s associates had taken them.

Sometime after the Downey Savings Bank robbery, Lopez and Hernandez moved in together and had a child.  In January 2011, L.T. appeared at Lopez's mother's thrift store and ordered Lopez to rob a nearby U.S. Bank branch.  Lopez complied because L.T.'s associates were holding his child and Hernandez at the store.  L.T. provided Lopez with instructions, gave him a note for the teller, and drove him to the bank.  After the robbery, Lopez found his son and Hernandez safe at his mother's store.

Over Lopez's objection, the trial court allowed the prosecutor to question Lopez about the earlier Wells Fargo Bank robbery Hernandez had informed the police about during her interrogation.  Lopez denied involvement in that robbery.

**Verdicts and Sentencing**

The jury found Hernandez guilty of kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1))[6] and carjacking (§ 215, subd. (a)), and found true the special enhancement allegations that a principal was armed with a firearm (§ 12022, subd. (a)(1)) and Hernandez took property with a value exceeding $50,000 (§ 12022.6, subd. (a)(1)).  The trial court sentenced Hernandez to a life term for kidnapping to commit robbery, plus a consecutive one-year term for each of the two enhancements, for a total term of life plus two years.  The court imposed and stayed the sentence for carjacking.

Lopez's jury found him guilty of the same crimes as Hernandez and found the same property loss enhancement allegation to be true.  In addition, the jury found Lopez personally used a firearm during commission of kidnapping to commit robbery and carjacking.  (§ 12022.53, subd. (b).)  The jury also found Lopez guilty of the second degree robbery of Zettino (§ 211) and the second degree commercial burglary of U.S.

---

[6] Further statutory references are to the Penal Code unless otherwise indicated.

Bank (§ 459).  The trial court sentenced Lopez to a life term for kidnapping to commit robbery, plus a consecutive 10-year term for the firearm enhancement, a consecutive one-year term for the property loss enhancement, and a consecutive five-year term for the robbery, for a total term of life plus 16 years.  The court imposed and stayed the sentence for carjacking and commercial burglary.

## DISCUSSION

### Hernandez's *Batson/Wheeler* Motion

Hernandez, who identifies herself as Hispanic, contends the trial court erred in denying a *Batson/Wheeler* motion she made after the prosecutor exercised five of its seven peremptory challenges to excuse Latino or Hispanic prospective jurors.  The court found no prima facie case of discrimination.

#### Proceedings below

A prospective juror identified as "M.O., 1696" filled seat number five after the defense exercised a peremptory challenge.  The trial court engaged juror number five in the following brief voir dire before the prosecution used its next peremptory challenge to excuse this prospective juror:

"[The Court]:  Welcome, juror number five.  Do you agree with all the legal principles I have spoken of?

"Prospective Juror No. 5:  Yes.

"The Court:  Thank you.  First six questions, please [indicating the juror should respond to the standard biographical questions about residence, employment, marital status, children, prior jury service].

"Prospective Juror No. 5:  Palmdale, 13 years.  [¶]  I'm a parts worker.  [¶]  I'm single.  No spouse.  No kids.  [¶]  And no jury experience.

"The Court:  Any yes answers [to additional standard questions regarding relationships with individuals in law enforcement, victims of crime, persons accused of crimes, etc.]?

"Prospective Juror No. 5:  No.

"The Court:  Can you be fair?

7

"Prospective Juror No. 5:  Yes."

Neither Hernandez's counsel nor the prosecutor asked this prospective juror any questions.  The prosecution immediately used a peremptory challenge to remove the juror.

Hernandez's counsel then made a *Batson/Wheeler* motion.  To establish a prima facie case of discrimination, Hernandez's counsel pointed out both Hernandez and co-defendant Lopez are "of Latin descent" and the prosecution had used five of its seven peremptory challenges to remove Latino prospective jurors, including juror number five.  Hernandez's counsel conceded there were reasons for the prosecution to remove some of the prospective jurors based on "things they said," but stated he found the removal of juror number five "more concerning" because the juror "said nothing with regard to anything other than where he lives and his occupation."

The trial court confirmed the prosecution had used five of its seven peremptory challenges to remove Hispanic jurors, but did not find a prima facie case of discrimination.  The court noted the prosecution had "accepted the panel on a number of occasions" when four Hispanic men and three Hispanic women remained on the panel.  The court also noted there were "fairly obvious" reasons for the prosecution's removal of "some of the Hispanic jurors," as Hernandez's counsel had conceded in making the motion.  The court did not address juror number five specifically.  The court allowed the prosecution to respond to the motion, but the prosecutor declined.

**Applicable law**

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race.  (*Batson*, *supra*, 476 U.S. at p. 97; *Georgia v. McCollum* (1992) 505 U.S. 42, 59; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)  Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article 1, section 16 of the California Constitution."  (*People v. Lenix* (2008) 44 Cal.4th 602, 612.)  "The *Batson* three-step inquiry is well established.  First, the trial court must determine whether the defendant has made a prima facie

8

showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims." (*Id*. at pp. 612-613.)

Our review is limited to the first step of the *Batson* three-step inquiry because the trial court found Hernandez failed to present a prima facie case of discrimination. "To make a prima facie showing of group bias, 'the defendant must show that under the totality of the circumstances it is reasonable to infer discriminatory intent.'" (*People v. Davis* (2009) 46 Cal.4th 539, 582, quoting *People v. Kelly* (2007) 42 Cal.4th 763, 779.) In *People v. Davis*, *supra*, the California Supreme Court reviewed the types of evidence on which a party may base a prima facie case: "'Though proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned "certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic–their membership in the group–and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention."'" (*Id*. at p. 583.)

9

"[W]hen a trial court denies a [*Batson/*]*Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.]  As with other findings of fact, we examine the record for evidence to support the trial court's ruling.  Because [*Batson/*]*Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.]  If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm." (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

**Analysis**

The trial court erred in finding Hernandez failed to make a prima facie showing of group bias.  The record reveals no obvious reason for the prosecutor's removal of juror number five.  The trial court's voir dire was brief, limited to standard biographical data. Neither Hernandez's counsel nor the prosecutor asked this prospective juror any questions.  Hernandez raised a reasonable inference that discrimination was the reason for the prosecution's immediate removal of this juror.  Like Hernandez and co-defendant Lopez, this juror was Hispanic.  Stoffer, the victim of the charged offenses was not Hispanic, according to the record.  The prosecution used five of its seven peremptory challenges to remove Hispanic jurors from the venire.  Hernandez was not required to *prove* racial discrimination for the *Batson* inquiry to proceed past the first stage, only state a prima facie case, which her counsel did. (*Johnson v. California* (2005) 545 U.S. 162, 170 ["We did not intend the first step [of the *Batson* inquiry] to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.  Instead, a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred"].)  On this record, the court should have conducted the second and third stages of the *Batson* inquiry.

In urging affirmance of the trial court's ruling, the Attorney General "note[s] the prosecutor's repeated acceptance of a jury that included Hispanics" prior to the removal

of juror number five. This circumstance, while relevant to the *Batson* inquiry, does not defeat Hernandez's first-stage prima facie showing. Hernandez raised a reasonable inference of discriminatory intent in the prosecution's removal of juror number five. The exclusion of one prospective juror based on race is a constitutional violation regardless of how many jurors of that same race remain in the venire or ultimately serve on the jury. (*People v. Motton* (1985) 39 Cal.3d 596, 607-608.)

As Hernandez acknowledges, the appropriate remedy when a trial court errs in ruling on the first-stage *Batson* inquiry is conditional reversal and remand. On remand the court "should attempt to conduct the second and third *Batson* steps. It should require the prosecutor to explain his challenges [to juror number five (badge number 1696)]. If the prosecutor offers a race-neutral explanation, the court must try to evaluate that explanation and decide whether defendant has proved purposeful racial discrimination. If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the prosecutor exercised his peremptory challenge[] improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenge[] in a permissible fashion, it should reinstate the judgment." (*People v. Johnson* (2006) 38 Cal.4th 1096, 1103-1104.)[7]

Because our reversal is conditional, we address the other issue Hernandez raises on appeal.

**Absence of Instruction on Attempted Kidnapping to Commit Robbery**

Hernandez contends the trial court erred in failing to instruct sua sponte on attempted kidnapping to commit robbery, a lesser included offense of kidnapping to commit robbery.

"'Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater

---

[7] Our reversal does not apply to appellant Lopez, as he had a separate jury.

cannot be committed without also committing the lesser.'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154, fn. 5.)  A trial court errs if it fails to instruct "on all theories of a lesser included offense which find substantial support in the evidence.  On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support."  (*Id.* at p. 162.)  The "existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude"' that the lesser offense, but not the greater, was committed."  (*Ibid.*)

Attempted kidnapping to commit robbery is a lesser included offense of kidnapping to commit robbery.  (*People v. Mullins* (1992) 6 Cal.App.4th 1216, 1221.)  A conviction for kidnapping to commit robbery requires proof the movement of the victim "is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in," the robbery.  (§ 209, subd. (b)(2).)  A conviction for attempted kidnapping to commit robbery requires proof "the defendant had the specific intent required for kidnapping to commit robbery and that the movement, *if completed as the defendant intended*, would have been more than merely incidental to the underlying crime of robbery and would have substantially increased the risk of harm over and above that necessarily present in the robbery."  (*People v. Mullins*, *supra*, 6 Cal.App.4th at p. 1221, italics added.)  A conviction for attempted kidnapping to commit robbery is proper, for example, where the defendant's "intent was to move [the victim] much farther and that he was prevented from doing so only by her successful escape."  (*Id.* at pp. 1220-1221.)

In this case, the trial court instructed the jury on kidnapping to commit robbery and also the lesser included offense of simple kidnapping.  Hernandez did not request instructions on attempted kidnapping to commit robbery and the court did not instruct the jury on this crime.

12

There is no evidence in the record indicating Hernandez and Lopez intended to move Stoffer farther than they did, and Hernandez does not argue otherwise on appeal. Thus, instructions on attempted kidnapping to commit robbery were not warranted. Hernandez argues the evidence did not establish (1) the movement was sufficient to constitute kidnapping to commit robbery, and/or (2) the movement substantially increased the risk of harm beyond that necessarily present in the robbery. This suggests a challenge to the sufficiency of the evidence supporting the conviction for kidnapping to commit robbery, not an argument in support of instructions on the lesser included offense of attempted kidnapping to commit robbery.

To the extent Hernandez challenges the sufficiency of the evidence establishing that Stoffer's movement satisfies the elements of kidnapping to commit robbery, we reject her challenge. Substantial evidence in the record supports a finding the movement was not merely incidental to the robbery. In reviewing this element, "the jury considers the 'scope and nature' of the movement," including the distance moved and "the context of the environment in which the movement occurred." (*People v. Rayford* (1994) 9 Cal.4th 1, 12.) Hernandez and Lopez took Stoffer from her home and drove her at least two blocks to the bank. The movement was not merely incidental, i.e., a few feet or from one room in her home to another. Substantial evidence also supports a finding the movement subjected Stoffer "to a substantial increase in risk of harm above and beyond that inherent in robbery." (*Id*. at p. 13.) Lopez forced Stoffer into the backseat of the car and held a gun to her head as Hernandez drove, increasing the risk Lopez would shoot her or Hernandez would drive her to a secluded location with which Stoffer was unfamiliar. The evidence also shows defendants attempted to avoid detection of the crimes by ordering Stoffer to recline in the backseat, where she was not visible to someone looking in from the outside.

**Admission of Evidence of an Uncharged Bank Robbery**

Lopez contends the trial court abused its discretion in allowing the prosecutor to question him about the Wells Fargo Bank robbery Hernandez had described to detectives.

Under Evidence Code section 1101, evidence of an uncharged crime is inadmissible to prove a defendant's disposition to commit a charged crime, but is admissible "to prove some fact" relevant to the charged crime, such as "motive, opportunity, intent, preparation, plan, knowledge, [etc.]." (Evid. Code, § 1101, subd. (b).) "To be admissible to show intent, 'the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1194.) The trial court must exclude the proffered evidence, however, if its probative value is "substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.* at p. 1195, citing Evid. Code, § 352.) We review the trial court's admission of evidence for abuse of discretion. (*Ibid.*)

Initially, the prosecution introduced evidence of the Wells Fargo Bank robbery in its case against Hernandez only. Detectives testified Hernandez admitted she and Lopez had committed an earlier robbery of Wells Fargo Bank alone, without L.T.'s involvement. Hernandez's jury also heard the audio recording of Hernandez's police interrogation describing the manner in which she and Lopez had committed the Wells Fargo robbery: Hernandez waited outside for an employee to open the bank doors, she entered the bank, followed by Lopez, then demanded cash, which she and Lopez took.

The Wells Fargo Bank robbery Hernandez described was very similar to the original plan for the Downey Savings Bank robbery that Lopez described to detectives during his interrogation. Lopez told detectives L.T.'s original plan was to have a woman wait outside for the bank manager, follow the manager inside, followed by other accomplices, and rob the bank. The jury heard the audio recording of Lopez's police interrogation.

When Lopez testified in his defense, he admitted he committed the Downey Savings Bank and U.S. Bank robberies but denied he did so with the requisite criminal intent. He claimed he committed the crimes under duress because L.T. threatened to harm his loved ones. The prosecution sought to introduce evidence of the Wells Fargo

14

Bank robbery in its case against Lopez to prove he had the requisite criminal intent to commit the bank robberies and was not operating under duress from L.T.

The trial court did not abuse its discretion in allowing the prosecutor to ask Lopez (1) if he committed the Wells Fargo Bank robbery (which he denied), and (2) if the original plan for the Downey Savings Bank robbery was similar to the Wells Fargo Bank robbery as executed (which Lopez said he did not know). By these questions, the prosecution sought to introduce evidence showing Lopez and Hernandez had committed an earlier bank robbery on their own without L.T.'s involvement. The probative value of the evidence was not "substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Cole*, *supra*, 33 Cal.4th at p. 1195.) The prosecutor's examination on this issue was brief. The evidence was important to undercut Lopez's duress defense.[8] The similarity between the Wells Fargo Bank robbery—committed without L.T.'s involvement—and the original plan for the Downey Savings Bank robbery—allegedly planned by L.T.—was striking.

**Section 12022.6 Enhancement**

Lopez contends the trial court erred in imposing a consecutive one-year term for the property loss enhancement under section 12022.6, subdivision (a)(1), because the jury did not make the requisite factual finding. We agree.

The information alleged Lopez and Hernandez, "with the intent to do so, took, damaged, and destroyed property of a value exceeding $50,000," within the meaning of section 12022.6, subdivision (a)(1), in the commission of kidnapping to commit robbery (count 1) and carjacking (count 6). The jury found the allegation to be true in connection with counts 1 and 6 as to both defendants. The trial court imposed a one-year consecutive term on count 1 as to both defendants and imposed but stayed the enhancement term on count 6.

---

[8] As discussed above, the prosecution also presented evidence of Lopez's intimate knowledge of banking procedures, which undercut his duress defense.

15

Section 12022.6 mandates a one-year term when the property loss exceeds $65,000, not $50,000. (§ 12022.6, subd. (a)(1).) Here, the information alleged the property loss exceeded only $50,000 and the jury found the property loss exceeded only $50,000. Thus, the trial court erred in imposing a one-year term under section 12022.6, subdivision (a)(1).

The Attorney General urges that we affirm the enhancement because evidence in the record establishes "Lopez stole over $100,000 in the Downey Savings robbery." A defendant "is entitled to have the jury decide every essential element of the crime and enhancement charged against him, no matter how compelling the evidence may be against him." (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71.) Accordingly, we decline to make factual findings as part of our review of the trial court proceedings.

In the alternative, the Attorney General suggests we remand the case for retrial on this issue. We will not allow the prosecution to amend the information at this late date.

We reverse and strike the section 12022.6 enhancement as to both defendants. Although only Lopez raised the issue on appeal, we may reach the issue as to Hernandez because we are correcting an unauthorized sentence, one the trial court could not lawfully impose. (*People v. Scott* (1994) 9 Cal.4th 331, 354 ["the 'unauthorized sentence' concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal"].)

## DISPOSITION

As to Hernandez, the one-year sentence enhancement under section 12022.6, subdivision (a)(1), is reversed and stricken. The judgment, as so modified, is conditionally reversed and the cause remanded for further proceedings on Hernandez's challenge to the prosecution's use of a peremptory challenge to juror number 5 (badge number 1696). If the trial court determines the challenge was exercised for a race-neutral reason, the court shall reinstate the original judgment as modified. If, however, the trial court finds that due to the passage of time or for any other reason it cannot adequately address the issues on Hernandez's *Batson/Wheeler* motion or make a reliable determination on that motion, or if it concludes that the prosecutor exercised the

16

challenge on the basis of the juror's race, the judgment shall remain reversed and the court shall set the case for a new trial.

As to Lopez, the one-year sentence enhancement under section 12022.6, subdivision (a)(1), is reversed and stricken.  In all other respects, the judgment is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


JOHNSON, J.


17