Filed 12/19/23  P. v. Nazareta CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SAM ELLIOTT NAZARETA,<br><br>        Defendant and Appellant. | A162377<br><br>(Contra Costa County Super. Ct. No. 51820497) |

Sam Elliott Nazareta appeals after a jury convicted him of first degree murder.  He contends the prosecution violated *Batson-Wheeler* by using a peremptory challenge to dismiss a juror because of the juror's race or ethnicity.[1]  We agree and will reverse the judgment.[2]

## BACKGROUND

The prosecution charged Nazareta, along with co-defendant Christova Topete, with murdering Joseph W.  The prosecutor also

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

[2] As the Attorney General did not timely file a respondent's brief, we decide this appeal based on Nazareta's opening brief.

charged Topete with a special allegation of personal use of a firearm and firearm-related offenses. After a month-long trial in August and September 2020, the jury found the special allegation was true and both defendants guilty as charged. The trial court sentenced Nazareta to 25 years to life in prison and Topete to 50 years to life in prison.

The trial court conducted jury voir dire between August 5 and August 14, 2020. The trial court did not use a jury questionnaire because of concerns about transmission of COVID-19. It chose instead to give the parties twice as much time during voir dire to examine the jurors. After reviewing for hardships, each day the court asked a panel of 20 jurors some preliminary questions for about an hour or an hour and a half, and then turned over the rest of each day to allow the parties to question the panel.

During the trial court's voir dire of juror A., A. stated that he was an IT analyst for UCSF and his spouse was a data manager for Contra Costa County.[3] He had two sons, ages 20 and 21, both of whom were students. He had never been on a jury before. Neither A. nor anyone close to him had been involved in a criminal matter, and he did not have any close family or friends in law enforcement. He did not have any strong feelings about guns or any of the concepts the trial court had

---

[3] The reporter's transcript generally refers to jurors by last name. In the interests of protecting their privacy, we refer to them by their last initial. (Cal. Rules of Court, rule 8.90(b)(10).)

2

explained, such as the presumption of innocence, the burden of proof, or the jury's role.

Topete asked A. what his children were studying, and A. responded, "Computer science and undeclared." A. clarified that his spouse's data management work for the county did not involve the court. Topete then asked, "And I wrote down that you're an IT analyst. Who are you analyzing? Other employees or data? Or what are you doing?" A. replied, "Both data and desktop support." A. later affirmed to Topete that he could follow the rule that a jury cannot consider the fact that a defendant chooses not to testify.

During the prosecutor's questioning, A. said that he had lived in Contra Costa County for five years and in Alameda County before that. He did not have any problems with the concepts of aiding and abetting, two examples of which the prosecutor had provided. A. had no problem with needing to use circumstantial evidence to figure out what someone was thinking. He would evaluate a witness with a different lifestyle, such as one who used drugs or had a criminal history, just like all other witnesses.

The prosecutor then asked, "Anything else in your background?" A. replied, "Nothing else."

During his portion of voir dire, Nazareta asked whether A. would commit to applying the judge's rules critically and dispassionately, despite the fact that the case involved someone's death. A. said, "I will. Happy to serve." A. also said he could apply circumstantial evidence to determine whether the mental

3

state of an aider and abettor had been proven beyond a reasonable doubt. He committed to voting accordingly if the circumstantial evidence had a reasonable conclusion that pointed to not guilty.

Following voir dire, the prosecutor used her first peremptory challenge on juror D., her eighth on juror L., and her fifteenth on A.

After the prosecutor excused A., Nazareta objected based on *Batson-Wheeler*. His counsel stated that Nazareta is Filipino, as are D., L., and A., making A. the third challenge to a Filipino juror. Nazareta argued that A. did not give any answers that indicated a bias for either side. Given the number of challenges to jurors of the same race and ethnicity as himself and the circumstances of A.'s answers, Nazareta urged the court to draw an inference of discrimination. Topete joined the challenge.

The court stated that it did not know Nazareta was Filipino and could not tell from the jurors' names whether they were Hispanic or Filipino. When the court asked the prosecutor whether there was anything she wanted to say about whether Nazareta had shown a prima facie case of discrimination, the prosecutor likewise said she did not know the three jurors were Filipino. Speaking without her notes, the prosecutor then briefly stated her reasons for challenging the three jurors. As to A., she said that she knew very little about him, he was not forthcoming with his answers, and he worked alone and not in a group. She said given the number of unknowns about A., the other jurors

4

coming up, and the number of peremptory challenges she had, she chose not to roll the dice on someone she knew little about.

The court told the prosecutor to get her notes. When she returned, the court said that it accepted Nazareta's representation that the three jurors were Filipino and would, for the purposes of the hearing, find that Nazareta had made a prima facie showing. The court then invited the prosecutor to finish her presentation with regard to the three jurors.

The prosecutor gave more detailed explanations of her reasons for excusing each of the three jurors at issue. As to A., the prosecutor said that he had lived in the county for five years and in Alameda County before that. She said A. worked in San Francisco as an analyst and worked alone and not in a group of people. The prosecutor described A. as "very, very vague in his answers" and said she knew "very, very little about him." She excused him because he was vague and did not have a group mentality.

Nazareta noted that he had not objected to the excusal of D. and L., but he argued that A. being the third Filipino juror showed a pattern and the prosecutor's reasons for excusing A. were vague and did not point to specific answers that A. gave. Topete added that A. was forthcoming and not vague, and the facts that his "profession was data and he works alone" were not sufficient to rebut the prima facie showing.

The court accepted the prosecutor's race-neutral reasons for challenging D. and L. The court then turned to consider whether the challenge to A. was the beginning of a pattern or established

a pattern. The court commented that there was not very much information about him, in contrast to other jurors with whom the parties spent more time. The court noted that A. had no prior jury service, he had no family or friends in law enforcement, no one close to him was involved in a criminal matter, and he had two children who were 20 and 21 years old. The court said the parties and court knew his occupation and how long he had been doing it. The trial court mentioned that A. was happy to serve. The court then concluded, "On this record, based on the Court's information, I believe that -- or the Court will accept the prosecutor's representations that this juror was excluded for a race-neutral reason, probably won't accept this reason any more for a challenge to a Filipino juror." The court noted that the jury at that point included two jurors with last names that could have been Hispanic or Filipino. The court therefore denied the defendants' objection to the excusal of A. However, the prosecutor later excused one of the additional jurors the court had named.

## DISCUSSION

" 'Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender.' [Citations.] 'Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal.' [Citation.] When a party opposing a peremptory strike makes a prima facie case that the strike was motivated by impermissible discrimination (step 1), the proponent of the strike must offer a nondiscriminatory reason for that challenge (step 2).

6

[Citation.] The question then becomes (step 3) whether the opponent of the peremptory challenge has shown it ' "more likely than not that the challenge was improperly motivated." ' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1071 (*Baker*).) Because the trial court found Nazareta established a prima facie case of discrimination and the prosecutor stated her reasons for striking A., our review of the trial court's ruling begins with the third *Batson-Wheeler* step. (*People v. Smith* (2018) 4 Cal.5th 1134, 1147 [when trial court makes a prima facie finding of group bias and evaluates prosecutor's reasons for challenge, "the adequacy of the prima facie showing becomes moot"].)

" 'The existence or nonexistence of purposeful racial discrimination is a question of fact.' [Citation.] [¶] The answer to this factual question will ordinarily depend 'on the subjective genuineness of the race-neutral reasons given for the peremptory challenge.' [Citation.] A justification based on a mischaracterization of the record could reveal a discriminatory motive [citation], but might reflect a mere error of recollection [citations]. Likewise, a justification that is 'implausible or fantastic . . . may (and probably will) be found to be pretext[ual],' yet even a 'silly or superstitious' reason may be sincerely held. [Citations.] Of course, the factual basis for, and analytical strength of, a justification may shed significant light on the genuineness of that justification — and, thus, on the ultimate question of discrimination. [Citation.] But the force of the justification is significant only to the extent that it informs analysis of the ultimate question of discriminatory motivation."

7

(*Baker*, *supra,* 10 Cal.5th at pp. 1076–1077.) "A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility." (*People v. Smith*, *supra*, 4 Cal.5th at pp. 1157–1158.) The credibility of a prosecutor's race-neutral explanation can also be measured by the prosecutor's demeanor and whether the prosecutor's rationale is grounded in accepted trial strategy. (*People v. Miles* (2020) 9 Cal.5th 513, 539.)

Given the subjective nature of the third step *Batson-Wheeler* inquiry, " '[w]hen the trial court makes a sincere and reasoned effort to evaluate the [proffered] reasons, the reviewing court defers to its conclusions on appeal, and examines only whether substantial evidence supports them.' " (*Baker*, *supra*, 10 Cal.5th at p. 1077.) But "[w]hen 'the proffered reasons lack[ ] inherent plausibility or [are] contradicted by the record,' the court's failure to probe, or to explain, may eliminate the basis for deference." (*Id.* at p. 1078.) "Deference may also be inappropriate when the court evinces a misunderstanding of the legal inquiry." (*Ibid.*) Even when review is deferential, "that review remains a meaningful one." (*People v. Lenix* (2008) 44 Cal.4th 602, 621.) "When reasons are given for the exercise of challenges, an advocate must 'stand or fall on the plausibility of the reasons he gives.' [Citation.] The plausibility of those reasons will be reviewed, but not reweighed, in light of the entire record." (*Ibid.*)

Nazareta argues the prosecution dismissed A. because he is Filipino.[4]  This case is somewhat unusual in that there is no evidence that A. is Filipino beyond Nazareta's assertion to that effect.  However, the record is nonetheless sufficient to support Nazareta's *Batson-Wheeler* challenge.  A party raising *Baston-Wheeler* need only make " 'as complete a record of the circumstances as is feasible' " and need not establish the race of a juror by direct question and answer.  (*People v. Motton* (1985) 39 Cal.3d 596, 603–604.)  Additionally, a *Batson-Wheeler* challenge to the dismissal of Hispanic jurors can be based on the last names of jurors where the last names indicate Spanish ancestry and there is no other information available.  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1087.)  We apply the same principle to Nazareta's allegation that D., L., and A. are Filipino.  It makes no difference that the jurors' last names could be consistent with either Hispanic or Filipino ancestry, as striking them for being Hispanic or Filipino would be equally impermissible.

## I.   Misunderstanding of legal inquiry

The prosecutor offered three reasons for striking A.:  he worked alone, he was vague or not forthcoming in his answers, and the prosecutor knew little about him.  Before examining each

---

[4] Nazareta also argues on appeal that the prosecution's peremptory challenges to D. and L. were discriminatory.  Because we agree with Nazareta as to A., we need not consider whether the challenges to D. and L. were also discriminatory.  (*Baker*, *supra*, 10 Cal.5th at p. 1071 [" 'Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal' "].)

of these reasons and the trial court's ruling, we note at the outset that the trial court misstated the nature of the legal inquiry.  At the beginning of its ruling, the trial court said, "So to start with, I mean, looking at the first two jurors for which the defense claims that the pattern began, the Court cannot find that the pattern began with these jurors because there's abundant reasons" to excuse them both.  The trial court proceeded to explain why it believed the prosecutor had excused D. and L. for race-neutral reasons.  The court concluded that it did not believe those two peremptory challenges "began a pattern."  The court then turned to "really consider whether or not the challenge to [A.] is the beginning of a pattern or establishes a pattern."

Nazareta relied in part on the pattern of excluding D., L., and A. to make his prima facie showing.  The trial court's initial focus on whether the peremptory challenges to D. and L. demonstrated a pattern is therefore understandable.  But the trial court's continued focus on the existence of a pattern when it proceeded to the third step of evaluating the prosecutor's reasons for excusing A. was error.  "[T]he ultimate issue to be addressed on a *Wheeler-Batson* motion 'is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias.' " (*People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3, disapproved on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; accord, *Johnson v. California* (2005) 545 U.S. 162, 169, fn. 5 [*Batson* "declined to require proof of a pattern or practice" for a prima facie showing "because ' "[a] single invidiously

10

discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions" ' "].)  It may be difficult to make a prima facie showing of discrimination without evidence of a pattern.  (*Bell*, at p. 598, fn. 3.)  And because the ultimate burden of persuasion as to discrimination remains with the defendant (*Johnson*, at pp. 170–171), evidence of a pattern could remain relevant at the third *Batson-Wheeler* step.  But the question to be answered is still whether the prosecution impermissibly excused a juror based on membership in a cognizable group, which can be shown without proof of a pattern.  The trial court's framing of the issue as whether the prosecutor's peremptory challenge to A. began or established a pattern of discrimination was therefore incorrect.

*People v. Arellano* (2016) 245 Cal.App.4th 1139 demonstrates that the trial court could have sustained Nazareta's *Batson-Wheeler* objection to A. even without proof of a pattern. The trial court there found a prima facie showing of discrimination where the prosecutor excused all three African-American female jurors, but the trial court believed the prosecutor's race-neutral reasons and denied the defendant's *Batson-Wheeler* motions.  (*Id.* at pp. 1152–1156.)  The Court of Appeal agreed that the dismissal of the first two jurors was for race-neutral reasons but nonetheless reversed because the record did not support the prosecutor's stated rationale for dismissing the third juror.  (*Id.* at pp. 1168–1169.)  Likewise here, even after finding that the challenges to D. and L. were legitimate, the trial court could have granted Nazareta's *Batson-Wheeler* motion if the

11

dismissal of A. was not race-neutral (as we conclude, *post*, it was not).  The trial court's continued search for proof of a pattern demonstrates a misunderstanding of the legal inquiry, so deference to its ruling is not appropriate.  (*Baker*, *supra*, 10 Cal.5th at p. 1078.)

With this in mind, we turn to the prosecutor's reasons and the trial court's ruling.

## II.    Working alone

The prosecutor's first rationale, that A. worked alone, has a basis in accepted trial strategy.  A juror accustomed to working alone could be less willing to work together with the other members of a jury.  But, as Nazareta points out, the record does not support the prosecutor's statement that A. worked alone.  The prosecutor asked many other jurors about group work but never raised the topic with A.  A.'s only statements during voir dire that could bear on this issue came in response to Topete's question, "And I wrote down that you're an IT analyst.  Who are you analyzing?  Other employees or data?  Or what are you doing?"  A. responded, "Both data and desktop support."  This response to Topete's compound question indicates at most that he did not analyze employees.  It does not establish that A. did not work with other employees.  A.'s work analyzing data and desktop support indicates nothing about whether he worked alone or as part of a team, as data analysis and desktop support could both involve collaboration or frequent interactions with others.

Misstatements like this can impair a prosecutor's credibility and support an inference of discrimination.  (*Baker*,

12

*supra,* 10 Cal.5th at p. 1076 ["A justification based on a mischaracterization of the record could reveal a discriminatory motive"]; *People v. Smith, supra*, 4 Cal.5th at pp. 1157–1158.) However, we will not draw such an inference here because the prosecutor was not the only one who made the mistake. Topete also noted that A. worked alone. If Nazareta's co-defendant also believed that A. worked alone, it makes it more likely that A.'s answer was simply hard to follow in the thick of voir dire and the prosecutor did not invent the issue as a pretext. The prosecutor's misstatement is therefore equivocal and not necessarily indicative of bias. The prosecutor's failure to question A. about his work is likewise not necessarily indicative of bias, since the prosecutor could have omitted the questions about group work because she believed Topete had already covered the subject with his questioning. As our Supreme Court has repeatedly held, a mischaracterization of the record, even when the trial court did not identify it as such, can be a simple mistake and not an indication of a discriminatory motive. (*Baker*, at p. 1076 [citing cases].)

## III.    Vague or not forthcoming

The prosecutor's second rationale, that A. was vague or not forthcoming, also lacks support in the transcript of voir dire. Most of the questions asked of A. were yes or no questions or called for similarly short responses. A.'s answers, unsurprisingly, were brief and to the point, consisting of short phrases or sentences without elaboration. Since neither the court nor any of the parties asked A. questions that called for more detail or

13

pressed him to flesh out any of his answers, the brevity of A.'s answers does not mean he was vague or not forthcoming. We recognize that unlike the prosecutor's statement that A. worked alone, her impression of A. as being not forthcoming could have been based on observations of A.'s demeanor, which would not be reflected in the record on appeal. Had the trial court credited such a reason, this might have been sufficient, even though the trial court did not explicitly remark on anything unusual in A.'s demeanor during its summary of A.'s responses. (*People v. Reynoso* (2003) 31 Cal.4th 903, 926.) However, the trial court did not rely on A. being vague or not forthcoming when it denied Nazareta's motion, so this rationale is not sufficient to support the prosecutor's peremptory challenge.

## IV. Lack of information

The trial court credited the prosecutor's third reason, that she knew little about A., and this reason finds more support in the record. We will assume for the sake of argument that this rationale has a basis in accepted trial strategy, although we have discovered only one case that mentions a party excusing a juror for this reason. (*Unzueta v. Akopyan* (2022) 85 Cal.App.5th 67, 74 [party in civil case excused juror in part because he " 'was completely unknown to me compared to the other jurors' "].) This rationale nonetheless requires reversal.

The trial court, Topete, and Nazareta followed the same approach in questioning A. as they had for the other jurors, asking about his occupation, his spouse's occupation, his children's studies, prior jury service, close friends or family in law

14

enforcement or involved in criminal matters, ability to follow the jury's role, ability to apply the concepts of circumstantial evidence and aiding and abetting, and strong feelings about guns, the role of a jury, or a defendant's right not to testify. The prosecutor likewise asked A. most of the same questions she did of the other jurors, concerning his length of residence in Contra Costa County, ability to follow the concepts of aiding and abetting and circumstantial evidence, and willingness to believe witnesses who might have a criminal history or use drugs, but not his group work. A.'s responses to these various questions did not raise any obvious concerns, so there was no apparent reason for anyone to follow up with him to obtain more detail. As a result, if A. provided less material from which the prosecutor could evaluate him, that was because the prosecutor did not ask for more information from him and had no reason to.

The prosecution's decision to excuse A. for lack of information is therefore concerning. A prosecutor does not have the luxury of unlimited time to spend on each juror and must instead evaluate scores of jurors in a short period. But if the prosecutor wanted to learn more about A., she could have easily asked him more questions. Additional questioning would have been particularly appropriate given that the trial court opted not to use a jury questionnaire and instead gave the parties twice as much time to conduct voir dire as it normally would have. Given her failure to examine A. in more detail, the prosecutor's claim that she excused A. because she knew little about him is hard to credit and supports Nazareta's contention that she was acting

15

based on a hidden bias.  (*Baker*, *supra*, 10 Cal.5th at p. 1083 [" '[u]nder certain circumstances perfunctory voir dire can be indicative of hidden bias' [citation], particularly when there is a dearth of questioning 'on a subject a party asserts it is concerned about' "]; cf. *id.* at p. 1085 [lack of additional questioning not illuminating where potential jurors filled out lengthy questionnaire and each side had only a few minutes to question jurors individually].)

The trial court did not ask the prosecutor why she did not question A. further or point out the disconnect between her questioning and her claimed concern over a lack of information. This alone would be enough to eliminate the basis for deference to its ruling.  (*Baker*, *supra*, 10 Cal.5th at p. 1078 ["When 'the proffered reasons lack[ ] inherent plausibility or [are] contradicted by the record,' the court's failure to probe, or to explain, may eliminate the basis for deference"].)  But the trial court's expression of doubt about the prosecutor's stated rationale, combined with its failure to probe the prosecutor's explanation, undermines all confidence in the trial court's ruling. After the trial court agreed with the prosecutor's assessment that there was not much information about A., it went on to remark that it "probably won't accept this reason any more for a challenge to a Filipino juror."  Nazareta cogently points out that if the trial court was unwilling to accept the stated reason again, it calls into serious question why the court accepted it as genuine even as to A.  Considering the trial court's reservations, it is

unclear why it did not ask further questions of the prosecutor and delve further into her rationale.

Finally and most significantly, the trial court's statement about not accepting the prosecutor's rationale for another Filipino juror tips the scales towards reversal when considered in light of its earlier comment that it was considering whether the peremptory challenge to A. began or established a pattern. Taken together, these comments indicate the trial court did not believe the prosecutor's stated rationale but denied Nazareta's *Batson-Wheeler* motion anyway because the challenges to D. and L. were race-neutral and the challenge to A. was insufficient on its own to demonstrate a pattern. This is improper. "Excluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172.) The trial court erred in holding Nazareta to a higher standard of needing to demonstrate a pattern of discrimination, and the trial court's evident lack of belief in the prosecutor's reason should have resulted in the granting of Nazareta's *Batson-Wheeler* motion.[5]

## DISPOSITION

The judgment is reversed.

BROWN, P. J.

---

[5] In light of this conclusion, we need not consider Nazareta's additional argument that a comparative analysis of A. with seated non-Filipino jurors supports his contention that the prosecutor acted discriminatorily.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

*People v. Nazareta* (A162377)